Good morning. May it please the court, I'm Assistant Federal Defender Wendy Overmeyer for Frederick Williams, and I'll be arguing for the first seven minutes, reserving three minutes for rebuttal. And today I'll be addressing the suppression requests under Franks and some of the new trial requests. The large amount of exhibits illegally seized under the search warrant in this case best illustrates the totality of errors that occurred here both pre- and during trial. There were at least four procedural checks that should have caught this erroneous evidence, but it was they were not used in this case. There was no Franks hearing. There was no evidentiary determinations as to this evidence. The court did not keep a neutral position, and it opined on the evidence and exhibits in front of the jury. The first check would be a Franks hearing, and the defendant here timely filed a Franks motion. I know there was some dispute about that in the briefing. The motion was filed within 30 days of the second superseding arraignment, which is timely under the local rules. The magistrate held a hearing to set the dates for replies and also filed timely objections, which we supplied in our further excerpts of record. Kagan. If we agree with you that it was timely and preserved, why was there error in denying the hearing? Why was there error? Was there error denying the hearing? Error in denying the hearing, because he had met the standard. He had made the preliminary substantial showing for a Franks hearing. He argued with specificity as to not at least nine errors that Roland, the agent who wrote the affidavit, in detail. And he argued in his Franks motion. And he was a pro se defendant. This was his first person proffer, his personal knowledge. He knew who the confidential informant was. He knew that he had had a feud with that informant and the informant's involvement in this case. And he also relied on evidence. Now, he was incarcerated, so he couldn't attach affidavits and things like that. But he did say, I have evidence in the government's discovery. I can get DMV records, utility records, the State unemployment records, to prove these claims at a hearing. And we know he could, in fact, prove those things because those were proven at trial. When Roland testified, he testified that the records he claimed, these false records about Eric Lee Williams, he claims were submitted with a passport that he had in the affidavit saying, I found all these false records. He did not, in fact, find those records. He said, I couldn't find any records for an Eric Lee Williams. Those all came later. Those were not something he possessed at the time he checked the application. He also claimed there were photos of Williams making fraudulent withdrawals from ATMs. There were no photos of Williams. It was Dion, right? It was Dion, his brother. Yes. There are no photos of Williams taking money out of ATMs at all that was introduced at trial. We also know one of the cars that Roland says was That came out at trial. But what you have to show, right, is that there wouldn't have been probable cause if it had been factored in. Yes. What's your best shot at that argument? The best is just the information about the confidential witness, the Bruce Forrester, and his lengthy involvement and feud with Williams, his bias in that he was caught in this fraud. Forrester was caught in this fraud. You know, the unemployment agency was pursuing identity theft charges with the State, and none of this was in the affidavit, this connection of him to the actual offense, and also the motivation he had to blame it on Williams, that they were in this feud. And he had never, he hadn't talked to Williams in quite some time. One of the lay witnesses testified to that, that they had had this falling out. So the magistrate didn't know that this confidential witness was unreliable and didn't have that information in front of them to make the determination. And so that, at the very least, warrants a Franks hearing. And then at the hearing, you know, was where Williams could go forward and talk more about the intent or reckless disregard for this information. We do know Roland talked with some of the State investigators who were familiar with Bruce Forrester before this affidavit. But a hearing would really flesh that out more as to what exactly he knew and why he said these things in the affidavit when he testified to the opposite at trial. And moving to the trial, these exhibits were really the backbone of the government's case at trial. There were over 40 exhibits that came from the House where they seized this evidence. And it was the central core of the case. It was the beginning of their closing. The government said, we'll take you through some of the most compelling evidence, and we'll begin with the evidence taken from his house. Because that evidence really surveyed identity theft charges, which carry mandatory minimums here. It's a mandatory two-year consecutive sentence. And without those exhibits, it really undercuts especially those charges, but really all of these charges are so intertwined with the immigration fraud and the unemployment fraud, that without those, the government would have had to try his case very differently. So when these exhibits came in, Williams objected. They were brought in en masse, just, here's our exhibits, we'd like them admitted. The court said, well, first berated Williams in front of the jury, which it often did at trial, saying he hadn't objected timely to these exhibits, which he had. They were somewhere the subject of pending motion and liminese. And the court said, well, I don't know if these are relevant. We'll find out. And we'll see if they're relevant. But the court never exemplifies how this court treated most of the evidence, especially the government's evidence in this case. It just let it in without any evidentiary determinations under 401, 403, or 404, which we go through in detail in the brief. And this kind of, this climate of bias, where it let the government, you know, go forward with its evidence, but it really strictly limited the defense here. And I believe expressed a bias against the government in at least 18 instances, which, again, we outline in our brief where the court was very hostile to the defense and kept out evidence that would have been helpful to the defense, while letting in evidence for the government without doing any determinations. And the result is that it usurped the jury's role. It opined on the elements, the strengths and weaknesses of the defense's case. And it really didn't do the same as for the government. So it left the jury with the impression that the court had made up its mind about this case. And that warrants a new trial. In addition to... The jury, forgive me for interrupting, the jury didn't wholesale convict across the board in this case, right? They did not, no. There were a few... Every defendant acquitted of some charges? Yes, every defendant was, yes. Williams was still convicted of 21 counts, however. Particularly the ones that rested on the evidence seized from the residents. Sure. And I don't mean to minimize that. It's just that it seemed to me that the jury did a pretty good job of taking the charges one by one. Doesn't the record suggest that? Or isn't that what opposing counsel is going to say when he gets up? I just wanted to give you a chance to respond because that's my impression. Well, certainly, yes. I mean, these were multiple charges. And yes, they did go through and did acquit of several of the charges. That is true. But again, the other constitutional errors and evidentiary errors do require reversal to go back so that the trial may be conducted in a fair manner. And I don't want to take any more of my co-counsel's time. Thank you, counsel. Good morning, Your Honors. May it please the Court, Jacqueline Ternanzi, CJA for Jacqueline Gentle. Now, there are a number of issues raised in Ms. Gentle's appeal, but there are two categories of issues I'd like to discuss this morning with you that may be separated into two different categories, the first being the denial of Ms. Gentle's request for a separate trial and the second being the exclusion of evidence critical to Ms. Gentle's defense. Every criminal defendant is entitled to a fair trial. Jackie Gentle was denied her right to a fair trial because she was convicted not based solely on evidence solely of her conduct, but instead the overwhelming evidence of another person's conduct. While it's true that a defendant is not entitled to a separate trial solely because on the basis she is less culpable than a co-defendant, this presumes the circumstances that a jury is able to collate and separate the evidence admitted against defendants. Here, that was simply not possible for two reasons, the first being the weight of evidence offered against Frederick and the second, the way the government continually lumped Frederick and Jackie together throughout the trial. On that first point, it's not the amount of evidence admitted against Frederick, it's the subject of the evidence. The government used the evidence against Frederick to connect the dots in its case against Jackie. What the government lacked in evidence against Jackie, it leaned on in evidence it did have against Frederick. For example, during trial we hear evidence that Frederick searched the death records to find someone with the same name as his biological father. We hear evidence that a person left a work card at Frederick's house and then began receiving invoices for unemployment insurance benefits. We also hear evidence that Frederick alone was responsible for creating the two entities that the government alleges were the vehicles for his fraudulent scheme. We don't hear evidence of Jackie searching death records and there's also no evidence no one left their work card at Jackie's home and then began receiving invoices for insurance unemployment benefits. The only evidence we hear is her brother instructing her to do tasks and her completing these tasks, believing that these were for these companies. On the second point, Jackie and Frederick were continually lumped together throughout the trial. A limiting instruction could not reasonably allow the jury to collate and separate the evidence against Frederick and Jackie. Practically speaking, on one hand the government asks the jury to consider the evidence against each defendant individually, but then on the other hand uses a theory that the defendants were family members committed to a common criminal scheme. Throughout trial, the government groups Jackie and Frederick together. For example, the prosecutors stated, quote, we've got Frederick and Jackie using the identity of three deceased U.S. citizens. Quote, we have Frederick and Jackie also charged with theft of government money. This continued throughout trial as if these two were two peas in a pod. This sentiment was so cemented even after trial, the judge lumped them together during Jackie's sentencing hearing when he exclaimed, quote, I mean the defendants lied about everything. It was one big ripoff. In sum, Jackie was denied a fair trial. The jury heard evidence it would not have heard in a separate trial against Jackie alone. To the extent the prejudice could have been minimized, the government's theory prevented the effectiveness of any limiting instruction. As a result, we respectfully request that your honors reverse and remand for a new trial. The second issue I'd like to raise with you this morning concerns two pieces of evidence. Before we move on to that, none of the defendants renewed the motion to sever at the close of evidence. Is that true? That is true. Isn't that an amount to a waiver? Well, there is case law that states as long as the issue was diligently pursued, then renewing it at the close of evidence would have been a mere formality. The motion to sever, there was a motion to sever before trial and there was also a reply written to that motion and additionally, the trial judge adopted a report and recommendation denying that, denying the severance. So really, the way this trial was going, this would have been a mere formality, renewing the motion again. Well, what's your best case that the circumstances of this case would make it a mere formality to renew your motion to sever at the close of evidence? The fact that the motion was, there was a motion for the severance, there was a reply for the motion and then again, the judge adopted the report and recommendation, that's as far as it was diligently pursued. That was pre-trial, right? You did that before the trial started? That's correct. And you know, there were developments during the trial that, you know, could have swayed him, right, on to revisit the motion, but no motion was ever made. That's correct, Your Honor. Well, what's the best case you can cite for that proposition that your case is a case where it would be a mere formality? It was few. Can you cite a case similar to your case? I can't any further at this time, but I would be happy to submit supplemental briefing on that issue if you'd like. All right. Thank you. Okay. The second, I would like to raise two more issues with you this morning. They involve two crucial pieces of evidence that prevented Jackie from fully presenting her defense. I'm running out of time, so I'd really just like to address these very quickly. The first was a Department of Family Services report that... As to that report, since you are running out of time... Sure. What was in it that she didn't testify to? I'm going straight to prejudice. It really just corroborated her testimony, which was the only evidence. I mean, this corroborated her testimony. The only thing that happened was she testified to it. So this corroborated it, and had the jury heard about the abuse of nature that was documented between Frederick and Jackie, they may have been able to understand that. Okay. Is the other... I think I understand your argument on that one. Forgive me, but is the other one the A file? No. The other one is the comments that Judge Lean made, a magistrate judge made during these proceedings at a previous hearing when the judge refused to revoke... Oh, I see. Yes. Yes. The judge refused to revoke Ms.... This is a passport, the comment about the passport? Yes. Correct. She did not understand, Ms. Gentle did not understand her passport had been revoked. Okay. And what's your best argument that the magistrate judge's comments should have been admitted? My best argument would be that it was a self-authenticating record, and it could have came in under either state-of-mind, present-sense impression, or really the catch-all exception, because it was... Were any of those arguments made at trial? No, they were not, Your Honor. Okay. And I think I need to move on so that my co-counsel can go. Thank you. Thank you. Good morning, Your Honors, and may it please the court. My name is Mark Ebert, and I represent Ms. Carolyn Willis Casey. I'd like to start with the insufficient evidence issue. Ms. Willis Casey was convicted of only one count of mail fraud, specifically of causing the State Unemployment Insurance Department to mail to her using the U.S. Postal Service and to have delivered to her by the Postal Service a specific document dated September 1, 2010. And that was an element of the offense of conviction as the jury was instructed. The problem was that the government never submitted a copy of the document that was purportedly mailed to her. All they submitted was Government Exhibit 32, which the one witness who knew about that said that it showed only that the department had made a determination of the amount of money that she would be entitled to under the program. He did not indicate in any way that it showed that anything was mailed to her. And, in fact, GX 32 says nothing about a mailing. It only says that it's a determination of monetary benefits. The only evidence that they presented that this document had any evidentiary value was that of a Mr. Buck, who was a Federal agent, who started out his testimony about documents by the State Department by saying, I don't work for that department, I don't create them, I don't understand their terminology, you should really ask someone who does. And then, although the defense obviously objected lack of foundation and the district court agreed there was no foundation, he went on to answer the question saying, yeah, it shows that there was a mailing. There are two problems with that. One is, of course, he himself testified that he had no knowledge and the district court said there was no foundation. And the second is that the document itself doesn't say what he testified to. In other words, the government can call somebody who has no knowledge of an exhibit and admits he doesn't know what it says and have them say that that's the Declaration of Independence, but if the reviewing court looks at that document and sees a grocery receipt, that is not sufficient evidence to support the conviction. And this has to be taken into account given the context of the government's entire case, which was that a co-defendant of Ms. Willis Casey was submitting numerous requests for unemployment compensation in the names of people who had no idea that he was doing that and taking their money. And in fact, since this was all done online, he was using the same personal identification number for himself, for Ms. Willis Casey, and for six or seven other employees, again, who had no knowledge that this was going on. This alone, since the use of the mails was an element of the single offensive conviction, that alone should be enough to overturn that conviction. As to my other issue, Government Exhibit 239, that purports to show Ms. Willis Casey's 2009 tax return and her the W-2 that was submitted by somebody to support it. The defense moved to exclude it because it was a compilation rather than an actual document, not the best evidence, unreliable, no authentication, lacks foundation, and so on. But the judge voir dired the custodian, who was the only witness, and she admitted and the judge agreed. She didn't know who compiled it. She didn't compile it. She didn't know who submitted the documents that it supposedly summarized. She didn't know if the document was accurate. All she could say was, yes, this comes from the IRS computer. And you can see from the document itself that it's not Ms. Willis Casey's tax return for three reasons. One, she didn't sign it. Nobody signed it. People signed their tax returns. This was not a tax return. Two, every page says on the top, TR, PRT, do not process. And the witness said, yeah, that means it's not the document. It's a compilation of data taken from the IRS computer and put into this one. Roberts. There was no foundational objection at trial, correct? I'm sorry? There was no foundational objection. Yes, there was a foundational objection. As a matter of fact, the district. As to 239? Yes. And the judge said, yes, no foundation. But then he went on to answer it. Was there a motion to strike the answer? I do not believe. Not that I recall. But he did object. And even though the judge agreed, it was overruled. And the third reason you can see it is because the cover letter from the IRS to the prosecutor, I presume in response to a subpoena or request, says we no longer give you original documents. We give you these compilations. If you need a certified copy of the original document to present at trial, ask us and we'll send it to you. They didn't do that. Instead, they simply submitted the compilation. And, again, take it in context with the government's theory. The co-defendant, and there was a lot of proof of this, and, you know, this was government's tax returns, false W-2s on behalf of a lot of people who had no idea that he was doing this on their behalf. So did this more likely than not affect the verdict? Well, here's what the government prosecutor said in his closing argument. Quote, one of the most important exhibits to the government's case involving Ms. Willis Casey, that this is one of the most important exhibits to the government's case involving Ms. Willis Casey, end quote. And he went on to say that it proved that she lied about her employment and income, end quote, given that and the government's own allegation that this was the most important exhibit. That's a second and independent reason why this conviction should be overturned. Are there any questions? No. Thank you, counsel. Thank you. We'll hear from the government. Mr. Chief Judge, and may it please the Court, James Pierce of the United States. The defendants engaged in an extended and extensive fraud scheme encompassing false citizenship claims and improper access to government benefits. With one exception, this Court should affirm the convictions and sentences, and taking the claims in the order presented today. The Court correctly denied a Franks hearing in this case. We think it was untimely. In the reply brief, there was some discussion about the ---- But what if we decide it's timely? Fair enough. There needed to be an establishment of a deliberate or reckless false statement, and that even if those things were there, if one were to excise those false statements, there was still not adequate probable cause. We don't think that they were false statements. The counsel today emphasizes three. The birth certificate for Eric Lee Williams, that is something that the affidavit says that the agent found and verified that birth certificate. So there's nothing to suggest, and nothing at trial suggested that he didn't do that. It wasn't part of the State Department's record at evidence at trial, but it was nonetheless something that the agent said he found and looked at. Second, counsel points to today the Camry. The agent noticed at trial that that had been registered. And, in fact, Mr. Williams conceded that had been registered at one point to him as well, and then ---- Magistrate judge had been told that this individual had a reason to be biased against Mr. Frederick. I'll use the first names to avoid confusion. Fair enough. Should the magistrate judge have been told that? I don't think so. There was questions about ---- so the question is whether the individual was unreliable. And the information that Bruce Forrester had provided was, Mr. Williams is engaged in this fraud scheme. I know he lives at this particular address, and sort of some details. And then that commenced on a 13th ---- Counsel, what you're arguing ---- forgive me, but your time is ticking. What you're arguing is that he was ---- the information he gave was pretty specific and somewhat corroborated, and so that was sufficiently reliable. My question is different. And I grant you that. My question is different. Should the magistrate judge have been told that he had a reason to lie? This Court has said that magistrate judges are not naive and that they understand when the court ---- when the government comes in with cooperating witnesses, there are often biases at play. Perhaps it would have been a better ----  had a reason to lie? It may have been a better practice to do that, but I don't think that is a basis to overturn. I'm just looking for an answer to my question. I'm not talking about whether there was or was not probable cause. My question is much narrower. I think it would be better practice to have done that in this case. Thank you. There is no evidence, and this is something that needs to be proffered to get the hearing, that even if this Court were to treat those either omissions in the case of Mr. Forrester or these statements that we still don't think are false, that that was done deliberately or recklessly. And that is something that is a ---- needs to be done to get the hearing. And then finally, to get to a point ---- a question you raised, Judge ---- Judge Kristin, even if one were to excise that information, there is more than ---- than sufficient probable cause. There is 13 months of investigation from the point of Bruce Forrester's tip until the government seeks the search warrant. And that ---- the information in the affidavit describes both this ---- this false with specificity that Mr. Williams is, in fact, residing at the place that was ultimately searched. Counsel, just speaking for myself, it would be helpful for me if you could address Exhibit 275, the bull coming issue, and also Count 2. Okay. I'll start with Exhibit 275, the confrontation clause challenge. Yes. So in our view, that particular report is not testimonial. And Ms. Ellis, who testified about it, was competent to do it. I recognize that the non-testimonial argument is a harder one for us to make. Ms. Ellis did say we don't prepare this at request of investigators and we don't prepare this for specific cases. But it is part of an investigation, so it is a closer call. I think our stronger foot is ---- our stronger argument is on the point that it is not ---- that Ms. Ellis was entirely capable and competent to testify about it. So it's a little bit different than bull coming, just by the nature of what we're talking about. You can't have a lab technician go and rerun the lab test. That's correct. Right. So what's the record show about what she really did? I've read it, but I just would like your interpretation of it. It's a little bit opaque. Certainly, Your Honor. So what she did is there are raw numbers that come in about what a particular claimant's income is and what the benefit that spits out is. And then she can go behind the scenes when internal investigators go and look and see, okay, if this person wasn't entitled to the benefit, what is the overpayment amount? The investigator who did that assessment was Maria Hernandez. She also testified at trial and was subject to cross-examination. What Ms. Ellis did, she was not the author of the report, but she went and, in her words, went behind the scenes, checked all of the work that the authors of the report had done. She testified that all of the employees of the section that she worked in the Health and Human Services were trained the same way and were able to do the same kind of analysis. Precisely for this kind of reason, somebody may leave the agency, you still need to be able to adequately justify the report that is issued. Right. So she was checking their work, I think. And at one point, she even said she triple-checked it, and I'll grant you that. Right. But why didn't she just regenerate it? Why didn't she recreate it? Because that would be closer to bull coming, right? I think that would be closer to it, but she did — there's nothing to suggest a regeneration would have done anything other than the exact same numbers that were ultimately available in the underlying report. And if she checks, and indeed triple-checks, and comes up with the identical numbers, and she goes back and looks into the file and finds the lack of citizenship, as she testified that she did, there's no reason for her to then create a new report if, she says, I have reanalyzed and reverified everything that the original authors did. After she gave her first response in response to the government's questions, the judge said something to the effect of, well, now I am worried. And he asked a few questions. And what do you think she did in the follow-up responses that helped button it down? So the judge said, were you just adding up numbers? Was that basically all that you were doing? And she said, no. I went — and she used the phrase behind the scenes, and I think she quoted the NOMAX system, which is some sort of internal system that allowed her to go in and look at the analysis and then ensure herself that everything that was accurately done, and she could and had replicated the work that the original authors had done. It wasn't just adding up, in other words. Right. Is there someplace in the record where the jury was explained or somebody explained what the NOMAX system is or what it does? No. She referred to that, and there were no further questions either from the judge or from the parties at that point. Okay. Thank you. Well, she gave a brief explanation of the NOMAX system, didn't she? I mean, brief by a sentence and a half, just sort of saying it's the system that we use that collects that. Right. And that was about it. What about COUNT II? It's the false claim of citizenship on the one particular form, the visa form for the fiancé. The petition for Denise Williams, yes. Right. What about that? So I'm not sure precisely what Your Honor's question is about it. It was the form in which the ---- Why is it sufficient? Why is that? Because the form itself is one that Defendant Williams filled out in order to bring his fiancé in, and that form specifically says what is the basis of your citizenship, which then enables you to bring someone else in the ---- Right. But it doesn't say U.S. citizenship, and we've got this case law that's just about right on point. What do we do with that? Well, we disagree that the Smiley case is right on point. And in fact, Smiley itself has a sort of a mixed holding. On the one hand, it says when it's not clear that you're asking for U.S. citizenship, in other words, when the guy said I was born in New York and that nationality could have been sufficient, sure, that's not enough to uphold a conviction. But when you are asked, subsequently he's asked in an interview, in a way that it's specific that they're asking about his U.S. citizenship, then the Court affirms and says that is a place where that is sufficient to establish that you have made a false statement to somebody who ---- with reason to inquire. And our view is here the entire way to admit someone as an American citizen, when it's asking for your citizenship, maybe the form would be better if it said American citizenship, but it's a ---- on sufficiency review, construing inferences in the light most favorable to the verdict, that's more than enough to justify or to support that he was misrepresenting his American citizenship. I wasn't talking about ---- I didn't mean to refer to Smiley. I'm referring to this case. I don't know how to pronounce. United States v. Carione, Ninth Circuit case? Yeah. Is that familiar to you? Yeah. I don't recall the specific way in which it maps on to this case. I mean, I remember that the other side had emphasized Smiley as the basis for ---- It maps pretty neatly. It's the same kind of notion where, you know, what is your claim for citizenship? And he checks the box, I think, parents and naturalization, but doesn't say ---- in other words, it could mean Belizean citizenship. It doesn't say United States citizenship. And my understanding of the government's strongest argument here, but correct me if I'm wrong, is that in context he must have meant United States citizenship. That's correct. But it's this case law that we've got to grapple with. So I think you've answered my question. Yeah. And I think, again, it's a contextual response, which is that because he was bringing in someone with ---- that was premised entirely on his U.S. citizenship, that construing the inferences in the light most favorable was sufficient to establish that count. I'd like to return to some of the arguments raised, and particularly the questions of judicial bias and sidebars. Before you do that, didn't you say when you were opening your argument that all the convictions should be affirmed except one? And I was referring all the convictions and sentences. And in our brief, we agree that a remand for resentencing in Defendant Gentile's case for the obstruction of justice determination, that's what the exception that I was referring to. So a sentence, resentencing remand, not a conviction. Thank you. Counsel, what's your response to the third defendant's argument? She was only convicted of the one count of the one mail fraud count. What's the best, most direct evidence the government has that she caused that mailing? It's hard to give one because there are a series of things working together. But if I had to point to one piece, I would actually say it's Government Exhibit 63, which is ---- this is when Buck is testifying. And it's fair that Buck didn't have the detailed knowledge of Steve Zuelka, who worked in the Employment Division, and sort of described how the notice of monetary benefits were created and how debit cards were used. But what Exhibit 63 is, is actually Ms. Willis Casey's debit card history. And on that, and I think it's page 1585 of Mr. Williams' excerpt of records, he includes all the trial exhibits, I believe it there on that exhibit says, mailed. And so there is the indication. And this is why ---- But there is the ---- was the foundational objection, right? And I think no motion to strike, but I'm not trying to misstate the record. I'm trying to get it right and figure out what happened at trial. So that is ---- what you have just recounted, I believe, is all accurate. And I think what the government's response was, and I think ultimately how I understand the district court's ruling, is that Buck was up there talking about an already admitted exhibit. And frankly, you can put any witness up there to talk about an already admitted exhibit. And he can say, I don't know anything, but here is this exhibit already admitted that says, mailed. Now, to walk back, there were other pieces of evidence, some of which my friend on the other side referred to. Forgive me for interrupting, but just, you know, indicating that it was mailed is really consistent with defense counsel's theory, which is that Frederick was the mastermind, was having these things mailed to folks and intercepting them. I'm paraphrasing, but ---- So it's not inconsistent with that, but again, we're on a sufficiency review. And we wouldn't disagree with the idea that Frederick was the mastermind of the scheme here. I think the question with the defendants like Willis, Casey, and Gentle is, were they, like those group of people whose personal information was used, they didn't know about it, and the benefits flew ---- flowed only to the co-conspirators, or was she someone who was involved in the scheme itself? Well, that's the whole ---- right. That's what we're trying to figure out, whether the evidence was sufficient. One difference between these two defendants, the two women, one testified and one did not. As to Willis, Casey, am I correct in recalling that ---- it's a very voluminous record, so forgive me, but am I correct in recalling that she gave an interview even though she didn't testify at trial, that she gave an interview pretrial to an investigator or made a statement indicating that she was employed by one of the organizations that he ---- One of the fraudulent organizations. That he formed, and that that's the organization through which he made the unemployment claims. There were two organizations, but, yes, she did give a statement that she ---- and she was one of basically, other than the co-conspirators, there's some record dispute about there was some other individual, but who actually acknowledged working for what the evidence showed were fictitious organizations. But what other evidence is there about that count? About count 20. Is that the ---- That's the count on which Ms. Willis, Casey ---- So there is also Government Exhibit 32, which showed the benefits, and my friend on the other side referred to this, the benefits that had accrued to Ms. Willis, Casey through the Department of Environment ---- excuse me, Employment Training and Rehabilitation. Right. And then there was the general background information that Steve Zuelka had supplied about how the fraud scheme works. And it was sort of how benefit disbursement works, and then additionally how the fraud scheme worked. Right. And I'll grant you all of that and just ask for your ---- and then I won't belabor the point anymore. What's your best evidence that she caused this as opposed to somebody else using her name fictitiously? The jury convicted Frederick of using other folks' identities, so this is ---- seems to me this is her defense. That it was done without ---- In her name, but that she didn't cause it. That's what her defense is, so. So I think that it is both Exhibit 239, which we've talked about, and we can have a separate discussion about the admissibility of that exhibit. In other words, that she received a benefit from that, and her statement, which we've discussed earlier, that she actually was ---- she claimed to have worked for this company that the evidence suggested didn't actually exist. Okay. I'm happy to talk about 239. I would like to get back and discuss some of the sidebar and the judicial bias commentary, but obviously the Court's questions are most important here, so I will address that unless the Court wants to go elsewhere. In our view, there's sort of three responses to the sidebar issue. One is the judge did make some comments that I think were unfortunate and ill-considered, and this Court in the Ball case has said that about this district court judge in the past, and said that before this ---- excuse me, after this particular trial, that the judge didn't have that guidance at this point. But the comments were not as extensive. It's not all 18 or, in fact, 19 instances that Mr. Williams quotes in the brief. I think there were at most three or four that were ---- showed impatience towards him. There were some more that exhibited hostility, I think, towards some of the other defendants. But ultimately, ultimately, it was not as extensive, but to the extent that it created problems, the judge's curative instruction, which this Court in Ball and in Scott has indicated will help steer the jury away, and then as Judge Kristen indicated and as we will indeed stand behind, the jury's selective verdict indicated it didn't just wholesale convict Mr. Williams or, for that matter, any of the defendants. It went through and looked at the evidence and did that analysis. I want to turn to Ms. Gentle's severance claim. Of course, we're operating against the backdrop that defendants who are indicted together, particularly for conspiracy, are typically tried together. There's a preference in the Federal system for doing that. The fact that there is differing weight or quantum of evidence is not a reason, or one appears more culpable than another, is not a reason to resist that default preference. And frankly, again, sort of back to that selective verdict, arguably, the joint trial was more favorable to Ms. Gentle insofar as the jury, unlike with Mr. Williams, acquitted her of more counts that it convicted her on. And looking at, comparing her with, for example, Ms. Willis-Casey or Denise Williams, whose appeal is not before this Court, the jury credited the notion to a certain extent that those two, Willis-Casey and Williams, were not perhaps as involved, and rejected with Ms. Gentle's testimony before it the notion that she had been convicted, that she was somehow tricked into doing all of these things. And so that's why we think the severance, the Court correctly rejected severance. Judge Tsushima, you asked, we failed to raise the waiver. This Court can overlook our failure, of course, and we think on the merits, ultimately, the ruling was, was correct. Kennedy, your position amounts to, like, you're waiving the waiver, right? Well, we, in our brief, by failing to raise it, I think we effectively did it. Certainly, it would have been more prudent of us to have raised it, but I don't think, having not raised it in our brief, we can say anything other than that at this point. I'm not sure. In response to Exhibit 239, make sort of — I think the easiest way that this Court can uphold the Court's decision to admit it is that it's a party-opponent statement. This is a tax return. Ms. Willis-Casey did, in fact, sign it. I believe that's on 2808 of the excerpts of records. But courts regularly accept tax returns as a party-opponent statement, something that the individual, him or herself, actually filed. Additionally, I think, as we've argued in our brief, it would qualify as a business record. It would qualify under sort of the residual exception to hearsay. And frankly, Exhibit 239 really was most pertinent to the question of whether Ms. Casey was involved in the conspiracy at all. The jury ultimately acquitted her of that. And so to that extent, we think it would be harmless, even if it were improperly admitted, though, of course, as I've argued, I think that there are adequate bases for the Court to have admitted it as it did. I think I have covered what the defendants have raised, and I'm happy to — I'm happy to respond to any other questions. Otherwise, we would ask the Court to approve it. Kennedy. Defendants haven't raised it in an oral argument, but what's your position on the — I think it's a count-nine instruction on the — on the mail fraud conspiracy? One, you agree it's erroneous, and two, whether it is or not, why isn't it a harmful error? So this is the constructive amendment or variance argument? Is that correct, Your Honor? Yes. So — so in our view, we view there — there is — there is no — certainly no constructive amendment and no variance at all. Well, first of all, you think the instruction's correct? We think the instruction could have been worded better, but that it is not plainly or clearly incorrect. It says, in order to convict the defendants of conspiracy to commit mail fraud — I see my time is done, if I can finish. Thank you. Then — and then it lists the various elements, and it says it must find the defendants committed one crime charged in the indictment. In our view, contextually, that — that has to refer back up to conspiracy to commit mail fraud, particularly when viewed in light of the fact that when the government got up at closing argument and said, count-nine is the mail fraud count. You have to — this is related to the unemployment fraud scheme. On plain-error review, first of all, we think the instruction is not clearly or plainly erroneous, but that, in light of the government's closing argument, means there was no effect on the defendants' substantial rights. Thank you, counsel. Thank you very much. We'll hear rebuttal. Put two minutes on? Yes. Thank you, Your Honors. Just a quick response back to the Franks hearing issue, is that the government doesn't dispute that Roland's testimony at trial was clearly different from what he put in the affidavit, so that proves the intense, the reckless disregard for the truth element that could have been proven at a Franks hearing. And bias is absolutely crucial to put into an affidavit, and that's the Hall case and also the Perkins case, which actually the government's decided. Without those statements, without the confidential informant, all we're left with is one car outside of a house. There's no reasonable nexus that the defendant lived there or that evidence of a crime would be found there. No one saw the defendant come in or out. No one knows who left the car outside. Cars are often outside of a home. Maybe someone's a guest or something like that. That is not probable cause that there's going to be evidence of a crime at that residence because there's no proof the defendant lived at that residence. They didn't check a database. They didn't do utility checks. So that solidifies the Franks hearing. As for the hearsay issue, Bollcoming, it's not just that she re-ran numbers. It's that she didn't check the source of those numbers. She didn't look to verify the documents submitted underlying that report. And also the original author of the report was let go from the state agency or she was no longer working there, and we don't know why. And so Bollcoming also, it's not just that the numbers, are those correct? It's, is this author of this report credible? And he couldn't ask those questions because she wasn't available to testify. And he was convicted of those counts. It was counts 32 and 33. So that requires reversal. As for the count 9 constructive amendment, the, it allowed a conviction for any conspiracy. It was not limited to conspiracy of mail fraud only. And again, a constructive amendment is something that mandates reversal as to that count. And that was also the main count for sentencing. And so that would unbundle the sentencing here and require a new sentencing. And so we ask that this court remand for suppression or Franks severance and new trial. Thank you counsel. Thank you all for your arguments this morning. The case just argued to be submitted for decision.
judges: Tashima, Thomas, Christen